```
                    UNITED STATES DISTRICT COURT
                   SOUTHERN DISTRICT OF NEW YORK

In re:                                 :
                                             Docket #09cv6875
 DISH NETWORK L.L.C.,                  :

                    Plaintiff,         :

      - against -                      :

 ESPN, INC., et al.,                   : New York, New York
                                         April 7, 2011
                    Defendants.        :

----------------------------------- :

                       PROCEEDINGS BEFORE
                      JUDGE FRANK MAAS,
             UNITED STATES DISTRICT MAGISTRATE JUDGE

APPEARANCES:


For the Plaintiff:   FLEMMING ZULACK WILLIAMSON & ZAUDERER
                     BY:   DEAN NICYPER, ESQ.
                     One Liberty Plaza
                     New York, New York 10006


For the Defendant:   WEIL GOTSHAL & MANGES LLP
                     By:  THEODORE TSEKERIDES, ESQ.
                     767 Fifth Avenue, Suite 3358-2
                     New York, New York 10153
```

Transcription Service: Carole Ludwig, *Transcription Services*
                       141 East Third Street #3E
                       New York, New York 10009
                       Phone:  (212) 420-0771
                       Fax:  (212) 420-6007

Proceedings recorded by electronic sound recording;
Transcript produced by transcription service

## INDEX

### E X A M I N A T I O N S

| Witness | Direct | Cross | Re-Direct | Re-Cross |
|---------|--------|-------|-----------|----------|
| None | | | | |

### E X H I B I T S

| Exhibit Number | Description | ID | In | Voir Dire |
|----------------|-------------|-----|-----|-----------|
| None | | | | |

```
 1                                                      3

 2              THE CLERK:  Dish Network v. ESPN.  Counsel, state

 3   your names for the record.

 4              MR. DEAN NICYPER:   Dean Nicyper with Flemming

 5   Zulack Williamson & Zauderer.  We are counsel for the

 6   plaintiff, Dish Network L.L.C.

 7              MR. THEODORE TSEKERIDES:  Ted Tsekerides from Weil

 8   Gotshal & Manges, for defendants ESPN and ESPN Classic.

 9              THE COURT:   Good afternoon.

10              MR. TSEKERIDES:   Good afternoon.

11              MR. NICYPER:   Good afternoon.

12              THE COURT:   There was one thing I meant to look

13   up before the conference today but did not, which is what

14   is the fact discovery deadline in the case.

15              MR. NICYPER:   May 10.

16              THE COURT:   And expert discovery I think I just –

17   that I don't remember --

18              (interposing)

19              THE COURT:   -- I have a letter that says close of

20   fact discovery March 1.

21              MR. TSEKERIDES:   Yeah, that can't be – July was

22   it?

23              THE COURT:   Let's see whether I can find it.  Is

24   it something you folks submitted?

25              MR. TSEKERIDES:   It would have been a revised
```

```
1                                                         4
2   version.
3            MR. NICYPER:   There would be a revised pretrial
4   order.
5            MR. TSEKERIDES:   And it got moved to May?
6            THE COURT:   Fact discovery on or before May 10,
7   expert discovery by July 22, joint pretrial order by
8   September 16 or after final dispositive motion are decided.
9   Okay.  Dealing first with the Connolly deposition, I guess
10  I to some extent understand ESPN's chagrin, probably a mild
11  term, feeling that they were sandbagged because there was
12  correspondence that talks about agreeing to take the
13  deposition on one of some possible dates, and one seems to
14  suggest one day rather than two.  And I read the Saber v.
15  First Dominion Capital decision by my good friend Judge
16  Pitman which really is nothing more than common sense, but
17  I'm not sure answers the question here.
18           It says that presumptively you get two days, but
19  that's a rebuttable presumption.  Here, there's arguably
20  perhaps was an agreement to the contrary.  I don't think in
21  this case the presumption much matters.  What I think
22  matters is simply whether it's fair to say one day only.
23  And as to that, even though you think that, Mr. Tsekerides,
24  that the deposition of Mr. Ratchman may have been
25  inefficient, I looked at the excerpt you gave me, and it
```

```
                                                    5
 1
 2  doesn't seem to me that it's beyond the pale in terms of --
 3           MR. TSEKERIDES:   I would have more to add to that
 4  from yesterday's deposition though, Your Honor, to the
 5  extent it influences the court --
 6           THE COURT:   Okay.
 7           UNIDENTIFIED SPEAKER:   (inaudible)
 8           THE COURT:   I'm shocked.  I do think that two
 9  days is appropriate, so I am going to allow two days, and
10  I'd suggest that they ought to be two consecutive days --
11           MR. TSEKERIDES:   Well, can I be heard on that
12  before you make a final ruling because we may have to take
13  that up further.
14           THE COURT:   Sure.
15           MR. TSEKERIDES:   So putting aside what I think
16  you've already underestimated what was said with chagrin,
17  put that aside and just deal with the cause, because we do
18  not agree that there's good cause.  And I think their reply
19  letter highlights how this is abusive.
20           To claim that there are 1,500 relevant documents
21  is a joke, plain and simple.  For somebody to say that they
22  can't cull down and the best they can do is 1,500 relevant
23  documents highlights that this would be abusive.  And what
24  we're talking about is from seven hours to thirteen hours.
25  It wasn't, hey, can I get another hour in the frontend and
```

1

2  maybe in the backend, and we'll do nine hours.  Which if

3  they said, we might have listened to and could be an

4  alternative to consider.  But they're saying, no, give me a

5  full other day.

6       These are not claims, you know, when they talk

7  about 18 contracts; there's one contract, the contract

8  between the parties.  There are other contracts that have

9  things in them that impact the contract, but they're not

10  going to be taking 30(b)(6) questions of every single

11  contract with another distributor.

12       So when we're talking about the global scheme of

13  good cause, it's our position and remains our position and

14  maybe have to remain our position to the district court

15  that 13 hours is abusive.  But we'd be willing to talk

16  about something like eight or nine hours.

17       THE COURT:   Tell me more precisely what

18  Connolly's role at the company is.

19       MR. TSEKERIDES:   Connolly is with the contract,

20  he's a Senior Vice-President of the Media Networks, one of

21  the top guys, but not a top guy in the sense of, you know,

22  with no disparagement meant to CEO's, he knows things.  But

23  unlike some other cases where --

24       THE COURT:   And also he's not so high up that you

25  didn't offer him as the 30(b)(6).

```
 1                                                      7

 2              MR. TSEKERIDES:   What's that?

 3              THE COURT:   Not so high up that you didn't offer

 4   him as the 30(b)(6) --

 5              MR. TSEKERIDES:   I think the sweet spot --

 6              THE COURT:   You could have had --

 7              MR. TSEKERIDES:   -- would be a good way --

 8              THE COURT:   You could have had a different

 9   sacrificial lamb.

10              MR. TSEKERIDES:   Right.  I think the sweet spot

11   for Connolly, because, look, we don't - the 30(b)(6) could

12   have been anybody, maybe not a janitor, but anybody, but

13   Mr. Connolly fits a role where we thought it's actually

14   more likely they'll need less time because this person has

15   more knowledge.  We don't have to spend a lot of time

16   getting him knowledgeable because he knows a lot of things

17   already.

18              So he was involved in negotiation of the deal, and

19   he's involved in the SWAPS.  He'll be knowledgeable about

20   the other main claim, and I think there are two main

21   claims, and the other ones are more side shows in my view,

22   the SWAP, which is the roll-up/roll-down, you know, with

23   Comcast and DirectTV, and then Deportes issues.  And he'll

24   be knowledgeable about all that.  He'll be knowledgeable

25   about the smaller ones as well, but he will actually even
```

8

1
2  already, and what he doesn't know appropriately will be

3  prepared to be a 30(b)(6) on the other issues.  So he is a

4  knowledgeable person, I don't doubt that.

5          My view is you could get this deposition done in

6  seven hours.  I do think you could.  I do think 13 hours is

7  abusive.

8          MR. NICYPER:   This is a complicated case.  As

9  we've seen from all of the motions, and there's now been a

10  decision on the summary judgment motion, which is long and

11  goes through a very complicated analysis, these are not

12  simple claims.  There are 13 of them.  They're based on 18

13  contracts; they're based on provisions that the parties

14  have disputes over how to interpret language, not only in

15  the DISH-ESPN agreement, but also the meaning of the terms

16  in these other third-party contracts.  There are numerous –

17  when Mr. Tsekerides says there aren't 1,500 documents;

18  well, there are, I'm sorry, but there are.  There are 1,500

19  documents that have been produced that are relevant to Mr.

20  Connolly specifically.

21          Are we going to show him 1,500 documents?  Of

22  course not.  What we've done is we've culled those down

23  into the fewest possible documents we could show.  In other

24  words, in the Ratchman deposition, there were I believe 850

25  such documents.  We managed to cull those down to 50

9

1

2    exhibits.  We're doing the best we can here, but the fact

3    is this is a complicated case, there are a lot of issues

4    and a lot of discrete little issues that all have to be

5    addressed.

6           If we can do it in less than 13 hours or 14 hours,

7    absolutely we will.  The other depositions such as the one

8    yesterday finished in I think under six hours.  You know,

9    to the extent we can do it, we're not trying to be abusive.

10   I think even Mr. Ratchman's may have been under seven

11   hours.  We're trying to do this as quickly as we can.  If

12   he's there for another day, he's there for another day.  I

13   don't understand why it's abusive if it takes four hours or

14   seven hours, the day's going to be devoted anyway.

15          But the fact is it's a complicated case.  There

16   are a lot of issues to address.  This is the person who was

17   both personally involved and now is designated as the

18   30(b)(6).  This is only one witness out of seven or eight.

19   At this point, we haven't asked for any additional time for

20   the others, and I don't believe we anticipate it at this

21   point.  This is just one deposition.  There's certainly

22   nothing (inaudible) about this.

23          If I could address also the other issue of what

24   we've agreed to.  Frankly, we were involved in those

25   discussions, and I'm the one who feels ambushed now because

 1
 2    what we agreed to with respect to this deposition was that
 3    it could be a simultaneous deposition.  What we were
 4    agreeing to was, okay, fine, if it's a 30(b)(6) and a
 5    personal deposition, you know, per se you don't need to
 6    have two separate days.  We can do it together, we can do
 7    it simultaneous.  We said one day because that's what the
 8    rules allow, but at that point in time we --
 9              THE COURT:   But Mr. Tsekerides was writing
10    several times saying do you agree it's one day only, and as
11    I read the chain of correspondence, there was never really
12    a response to that.  I understand that your letter says,
13    once you got into the nitty gritty of the deposition, you
14    felt you needed two days, but --
15              MR. NICYPER:   Well - yes, I'm sorry.
16              THE COURT:   In terms of the, who wins the battle
17    of the record here, I think he does in that he never got a
18    clear answer to the, have you read that, like Crawford,
19    this will be done in one day only.
20              MR. NICYPER:   Well, then the problem is then we
21    were misled because my understanding when he said will this
22    be one day only, we're talking about this will all be done
23    together in a day.  And to the extent if he was asking for
24    something more and he didn't get an answer, then he has
25    nothing to rely on that there was some agreement that

```
 1                                                         11
 2   everybody agreed, regardless of how complicated the issues
 3   were, that it would be limited to one day.  I'd have to go
 4   back and review the communications, but I can tell you,
 5   based on my recollection and being consulted on these
 6   communications, our concept was this is a simultaneous
 7   deposition.  Yes, we agreed we don't have to do separate
 8   depositions for each, we can make them concurrent.  That
 9   was the approach we were taking here.
10            MR. TSEKERIDES:   I'm not sure it's relevant
11   anymore to what you were saying, but I do need to address
12   that.  I think it's absolutely clear, the one thing that is
13   above reproach, is that they never said we want 13 hours
14   until the other day.  But I think we can get past that.
15            For us, the issue still comes down to if you have
16   13 hours, they're going to take the entire time plus a
17   little.  Ratchman went over seven, and we were there a very
18   long time with Mr. Grusus yesterday - no, I asked the court
19   reporter about that.  And Mr. Grusus, I mean I'll just read
20   --
21            THE COURT:   You may be counting different ways.
22            MR. TSEKERIDES:   No, no, we had the time --
23            THE COURT:   Somebody may be doing clock hours;
24   somebody may be doing --
25            MR. TSEKERIDES:   To the extent it's relevant,
```

1

2  we'll get it, but I mean just some of the questioning

3  yesterday where counsel was asking an accountant guy – he's

4  in accounting, made it very clear from the beginning he

5  knows nothing about the interpretations – questions about,

6  well, you don't know what a tier package is, you don't know

7  what packaging is, and the guy says, look, I don't know.

8  And the question was, "Well, I think let me ask you this,

9  do you know that a package of something that you receive in

10 the mail sometimes," and it goes on from there.  I mean

11 come on, we don't need stuff like that.  And there's going

12 to be a lot of that.

13         The bottom line is this, if you're going to say 13

14 hours, we're going to have to consult with the client.  The

15 15th is not an available date.  They may decide to take that

16 up to the district court.  But for us then the issue is it

17 could be done in a day if you went with like nine hours

18 which I think is plenty of time.  Start at 8:30, go to 8

19 o'clock.  You can get it done in a day.

20         THE COURT:   Well, the difficulty I have is I'm

21 not in a position to, nor unless he has some divine

22 inspiration, is Judge Pauley in a position, I'm sorry,

23 Judge Koeltl in a position to know precisely what the right

24 number is, whether it's seven, nine, or fourteen.  It does

25 seem to me he is the 30(b)(6) witness, and he's the only

1

2  witness for which this request has been made in a case that

3  obviously is of some complexity.

4         So I'm going to adhere to the ruling I made.  Just

5  so it's clear, it's going to be 13 not 14 hours.

6         MR. TSEKERIDES:   Well, it's going to be 13 hours.

7         THE COURT:    Yeah.

8         MR. TSEKERIDES:    Thirteen hours.

9         THE COURT:    Correct.  But that's 13 hours of

10 deposition --

11        MR. TSEKERIDES:    Understood.

12        THE COURT:    -- not lunch, not breaks --

13        MR. TSEKERIDES:    On the clock on the record.

14        THE COURT:    So the court reporter or videographer

15 or both will have to keep track.

16        And obviously, and I have no reason to believe

17 that both sides won't be on their best behavior, if there

18 are lengthy objections, which there should not be, then one

19 may revisit that question.  You're free to take that up to

20 Judge Koeltl, but I'm not being specific to him, I can't

21 think of anybody who's ever succeeded on an issue like one

22 day versus two, but feel free if you want to.  That's

23 Connolly.

24        Then there's the Time Warner omnibus agreement.

25        MR. NICYPER:   Your Honor, there may be a bit of a

1

2     misnomer here.  That we've labeled it the Time Warner

3     omnibus agreement; the fact is we're in the dark.  We don't

4     know exactly what the correct title is, but we do know that

5     Mr. Ratchman specifically said a Time Warner agreement is

6     the basis for the offer they made on Deportes on December

7     6, 2010.  So what we want is the agreement --

8              THE COURT:   Is it clear that this is something

9     different than the handshake agreement?

10             MR. NICYPER:   See, that's the problem, we don't

11    know.  This is an issue - I know this came up once before,

12    this handshake agreement, the omnibus agreement, and they

13    submitted something to Your Honor in camera, and I'm a

14    little concerned about that because the issue there was we

15    wanted the agreement that had the substantive provisions,

16    in other words, the provisions that said what ESPN writes,

17    they were getting under that agreement.  And my sense is,

18    when Your Honor said there's nothing relevant here, that

19    maybe that wasn't the right agreement.

20             So I'm a little concerned, and that's why there

21    may be a misnomer here.  We're in the dark.  I don't know

22    what's in each of these agreements, but the agreement we

23    want, the agreement we wanted there was the one that had

24    the substantive provisions, and I get a sense they didn't

25    actually give that to you.

```
 1                                                       15
 2            The agreement we want here is the one that is the
 3   one that underlies this offer that was made on December 6.
 4   So when I say we think it's the Time Warner omnibus
 5   agreement, but, in fact, we don't really know the correct
 6   title of it.
 7            MR. TSEKERIDES:   Your Honor, Mr. Ratchman was
 8   very clear at his deposition that the Time Warner agreement
 9   he was talking about was the big agreement they did, the
10   one I talked to you about last time, on every asset, on
11   everything.
12            THE COURT:   Which is something different than the
13   handshake.
14            MR. TSEKERIDES:   It's part of it, and I think I
15   explained it in the letter.   You have the omnibus
16   agreement; the handshake agreement is exhibit A to that.
17            THE COURT:   Right.
18            MR. TSEKERIDES:   The internet agreement was a
19   separate agreement done at the same time.   The omnibus
20   agreement covers a bunch of different assets.   And they
21   know this because they did a Time Warner omnibus agreement
22   several years before.   It's the same type of thing.
23            What Mr. Ratchman said was when they did the Time
24   Warner deal for all these different assets, one of those
25   things that they did impacted the Deportes; it's September
```

                                                                    16

2010.  An important point to keep in mind, the September

2010 agreement was well after the lawsuit was filed.  It

could not have been part of their claim; it didn't even

happen yet.  So was that part of just because it references

Deportes?  Every time we do a deal with somebody with

Deportes, they get the agreement?  That's not right.

          They have a specific claim based on March and

June.  They even didn't have the one from May, but we gave

them that one anyway.  They have everything they're

entitled to.  The September 2010 agreement was well after

the lawsuit was brought, happens to deal with Deportes, but

so what?  There is no standing order that from now until

the end of time a Deportes deal, they get it.

          MR. NICYPER:   He says so what; I'll tell you

what.  The what is that they made another offer to us that

specifically connects to, by its terms, the earlier offers.

My recollection --

          THE COURT:   Those are those two letters?

          MR. NICYPER:   Yeah, tell me if I'm wrong --

          MR. TSEKERIDES:   The December letter does not.

          MR. NICYPER:   -- I believe it says this is an

offer in addition to those that were already offered.  So

it is directly tied in -

          THE COURT:   One of them has a --

```
 1                                                    17
 2            MR. TSEKERIDES:   It's not --
 3            (interposing)
 4            MR. TSEKERIDES:   It's not accurate, Your Honor.
 5            THE COURT:   -- option 2.1.  There's a May 5 --
 6            MR. TSEKERIDES:   That's the May 5 letter.
 7            THE COURT:   And then there's a --
 8            MR. TSEKERIDES:   December 6 letter.
 9            THE COURT:   -- December 6.
10            MR. TSEKERIDES:   The December 6 letter does not
11   say that at all, and I think we made that clear in my
12   letter to the court.  And that's why, because the March 5
13   letter did have that 2.1 --
14            THE COURT:   May 5.
15            MR. TSEKERIDES:   May 5 had the 2.1, and we said,
16   all right, listen, we think that even is beyond the pale,
17   but fine.  It related back to this other offer.  They
18   called it 2.1; we'll give it to you.
19            The December 1 has nothing to do with that.  It
20   came out of the September 2 agreement that hadn't even
21   happened yet.  They cannot be connected, they are not
22   connected, other than the fact --
23            THE COURT:   It came out of a September 2
24   agreement between whom?
25            MR. TSEKERIDES:   The September 2, 2010 agreement
```

18

1

2  between Time Warner Cable and ESPN for these multiple

3  assets that I was just talking about.

4          MR. NICYPER:   Each of these agreements, the Time

5  Warner-ESPN agreements, is a separate agreement.   There was

6  one I think back in November 2007, there was another one

7  later; those made up the basis for some of the offers

8  earlier on.   There were some later agreements that were

9  entered into.   Those made up the basis for some other

10 offers.   These are all Time Warner-ESPN agreements, and

11 this is another Time Warner-ESPN agreement.   It is another

12 basis for another MFN offer all with respect to Deportes.

13         MR. TSEKERIDES:   But, Your Honor, the difference

14 is all the other contracts that he's just talked about were

15 incorporated in the March and June letters.   All the other

16 ones were.   It cannot be, if they get that agreement, then

17 what they're saying is any time we do – what if we do a

18 deal tomorrow for Deportes, they get that too?   They don't

19 even have claim for that.   We don't even know what's going

20 on with that.   That can't be right.

21         MR. NICYPER:   No, they also were incorporated

22 into the May 5 offer.   So what he says is not --

23         MR. TSEKERIDES:   No, we gave them the May 5 one.

24         MR. NICYPER:   Exactly.

25         MR. TSEKERIDES:   The difference here is between

1
2    December – the May 5 refers back – the May 5 looks back to

3    the prior ones.   The September 2 agreement looks forward.

4    The December 6 offer is based on September 2.

5              MR. NICYPER:   These are statements he's making,

6    but --

7              MR. TSEKERIDES:   They're in my letter.   They're

8    in my letter and attached to my letter as exhibits.

9              MR. NICYPER:   I understand, but this is

10   information we don't have.   It's solely within the

11   possession of the plaintiff.

12             MR. TSEKERIDES:   Mr. Ratchman testified to that.

13             THE COURT:   Wait, one at a time.   You're going to

14   have Connolly as a 30(b)(6).   I'm not precluding

15   questioning about this.   To some extent, I understand you

16   may not have all the ammunition you want.   If at a later

17   stage I conclude that you're right, Connolly will be coming

18   back for even more time.   But at this juncture I'm

19   persuaded that Mr. Tsekerides has the better of this

20   argument, and I'm not going to require that the omnibus

21   agreement be produced.

22             Let's move on to the drafts of the December 6.

23             MR. NICYPER:   Your Honor, if I could, just while

24   we're still on the Time Warner agreement --

25             THE COURT:   Sure.

1                                                                      20

2          MR. NICYPER:   -- and going back to that September

3  agreement.  If I could raise, and I apologize, it wasn't in

4  the letters, but this did occur to us that this - and Mr.

5  Tsekerides I guess raised it in his letter - this was the

6  same issue or the same agreement that was an issue on the

7  document that was provided to Your Honor in camera.

8          The only question I have, there is some agreement

9  from that September 2 period between ESPN and Time Warner

10 that addresses the substantive rights that were granted

11 with respect to the ESPN channel.  We, again, renew our

12 request for that because I'm concerned that whatever was

13 provided to Your Honor may have been misnamed and,

14 therefore, was not the agreement that had those substantive

15 rights, and I, again, ask that that document be produced.

16         MR. TSEKERIDES:   Your Honor, we gave you the

17 handshake agreement which has - and you have it - it has a

18 bunch of different things relating to ESPN.  The one that

19 we gave them the rates.  But the omnibus agreement deals

20 with other channels, other issues.  You have the handshake

21 agreement.  That's the one that had the rates in it, and

22 then the other pages were redacted.  So you have the

23 agreement that is the basis for the ESPN internet issue.

24         MR. NICYPER:   He says redacted.  One of those

25 agreements has the right, it says we are granting you the

1

2  right to distribute ESPN in your packages, in your tiers,

3  in the expanded basic package.  We are grating you the

4  right with respect to ESPN to distribute it here and there.

5  There's some agreement that says that.

6        THE COURT:   I no longer recall whether that was

7  or wasn't the unredacted handshake agreement.

8        MR. TSEKERIDES:   Well, the handshake – well, if

9  he's talking about the agreement that gave them ESPN from

10  back in the day, well, no, I don't know that we gave them

11  that, but that wasn't what we were arguing about when we

12  were here that day.  We were talking about --

13        MR. NICYPER:   Of course it is.

14        MR. TSEKERIDES:   No, it's not.

15        THE COURT:   No, we were talking about some terms

16  that were capitalized terms, if I recall correctly, that

17  weren't defined in whatever agreement we have, and you

18  argued it would be defined or light would be shed on those

19  terms on the handshake.

20        MR. NICYPER:   Actually, that was one issue.

21  There was one issue that there were some undefined terms,

22  and we needed the agreement to define those terms.  But

23  there was a second and probably more critical issue and

24  that is this all arises out of the claim concerning what we

25  call the Section 3F.  That provision of Dish's agreement

22

with ESPN specifically says that they cannot distribute the

programming from the ESPN channel on the internet without

specifically requiring subscribers to pay for that specific

service.  They're given us the Time Warner agreement that

says Time Warner has the right to distribute ESPN on the

internet, and if you remember, there's some language in

there that says we're not charging you for this --

THE COURT:   We will deem your existing payments -

-

MR. NICYPER:   -- but we will deem your payment to

be this.  And so they gave us this payment document.

What we really want is that payment document is

actually payment for other services regarding ESPN,

essentially the services that they can launch and

distribute ESPN generally the channel over the regular

packages and tiers that Time Warner distributes ESPN.  In

other words --

THE COURT:   Say that again.

MR. NICYPER:   -- if you're a cable television

viewer, you'll be able to get ESPN.  So the right to Time

Warner to be able to distribute ESPN to its television

viewers over regular cable television, there's some

agreement that says they can do that, and, in fact, that's

what those payments are for.  And so we wanted the

1

2  agreement that shows that those payments are specifically

3  for the right to be able to distribute ESPN to cable, over

4  cable viewers.

5       What they then did was take this internet --

6       MR. TSEKERIDES:  But I don't think it's

7  appropriate to be --

8       THE COURT:  But you already have the documents

9  that show that, rightly or wrongly, what they did was say

10  whatever you're paying in the past, guess what, that also

11  covers this additional item.

12       MR. NICYPER:  It tells part of the story.  I

13  don't know whether that would be entirely clear to the

14  jury.  I think it's a lot clearer to actually have the

15  agreement that shows whatever you're paying in the past is

16  really for these other things such as distributing ESPN on

17  the regular cable, to your regular cable providers.

18  There's no question this is relevant because it goes right

19  to the core of this issue that somehow they're blocking us

20  from getting this agreement.  It's part of the evidence.

21       Yes, is there another way to help show that?  Yes,

22  but it's not entirely clear because the way they worded it

23  says, oh, but this, we'll say that this covers it too.  But

24  what we'd like to be able to show is, in fact, those rates

25  they provided really are applying to something else.  And

```
 1                                                    24
 2  they've admitted that that they really apply to something
 3  else.
 4            THE COURT:   I would imagine that Mr. Tsekerides
 5  would stipulate to that.
 6            MR. TSEKERIDES:   They do apply to other things,
 7  but the bottom line there is twofold.  I don't think this
 8  is --
 9            THE COURT:   Don't duck my question.  Would you
10  stipulate that they apply to other services or programming,
11  whatever the right buzz words are, and that, therefore,
12  what seemed to clear to me in reading what plaintiff's
13  already have, namely, that there was no new consideration
14  for what was being granted?
15            MR. TSEKERIDES:   Well, I'd have to think about
16  that, Your Honor.  I can tell you that the ESPN rate that's
17  in the Time Warner agreement is the rate that Time Warner
18  pays to get ESPN.  However distributed, whether it goes
19  over the internet or whatever, that's the rate.  It's an
20  all-in.  I mean if that's what you're saying, yes; if
21  there's something more than that, I don't know --
22            THE COURT:   Well, I guess, you know, and I'm
23  probably using the wrong buzz words, but the stip would be
24  that the fees that previously were paid were covered,
25  services, programming, whatever, other than distribution
```

1  over the internet.

2          MR. TSEKERIDES:   I don't know if it's quite like

3  that, and – well, two things.  One, I think Mr. Ratchman,

4  they didn't go into it, but Mr. Ratchman did give testimony

5  about our view of what 3F means.  So I do not agree that

6  there's any breach, or I think Your Honor might have used,

7  I forget what term you used, but you used the term last

8  time we were, but the view on that --

9          THE COURT:   I probably used the end-run --

10          MR. TSEKERIDES:   End-run, exactly, exactly.

11          THE COURT:   -- although I don't remember what I

12  used --

13          MR. TSEKERIDES:   No, that's the term that you

14  used.

15          THE COURT:   -- but it's occurring to me now.

16          MR. TSEKERIDES:   So he spoke about that.  But I

17  will say that the rate, and they have the rate, the rate

18  that Time Warner pays for ESPN is higher than the rate Dish

19  pays.

20          But as far as saying what do the components, I

21  can't break them down for you, but whatever ESPN rate is

22  for Time Warner cable is for them to have ESPN, *the*

23  network, however distributed.

24          I mean this is not appropriate for discussion, I'm

26

1

2  not prepared to talk about it today.  I can stipulate to

3  that point, but I'm to going to go back in and retry, they

4  didn't appeal what you said, and go back in to whether they

5  get the underlying agreements.  I think that's not

6  appropriate.

7          THE COURT:   Well, I'm going to not permit

8  discovery as to the omnibus agreement.  It's without

9  prejudice to a later application after, for example,

10 Connolly's deposed.

11         Then we get to the prior drafts of the December 6

12 offer, and let me put the onus on you, Mr. Tsekerides, why

13 isn't that relevant?

14         MR. TSEKERIDES:   Well, I'd say two things.  One,

15 if they don't get the omnibus agreement, they sure don't

16 get drafts of the letter because the letter was based off

17 of the agreement in September.  So all we have, again,

18 here's an offer.  So are you saying that every time we make

19 them an MFN offer for whatever, they get the drafts?  No.

20         Secondly, this was well after the litigation.  We

21 have not reviewed those documents for privilege, and I know

22 our firm, in addition to in-house people, by this time knew

23 that Dish that lurking out there.  I'm sure I might have

24 reviewed some of these documents.  But even beside the

25 privilege issue, it's the same thing; one flows from the

27

1

2    other.  So they shouldn't get those.

3            MR. NICYPER:   Your Honor, the issue really

4    becomes, and Mr. Tsekerides is trying to say every Deportes

5    offer is not relevant here, but, in fact, it's been the

6    defendant's position in this case that if Dish accepts a

7    Deportes offer, then to some extent that obviates their

8    claim or it eliminates their claim.  So it does drag in,

9    their position and one of their defenses on this does drug

10   in each of these offers and, therefore, the underlying

11   basis for each of these of offers.

12           THE COURT:   Did Dish accept the December 6 offer?

13           MR. NICYPER:   I believe it did.

14           THE COURT:   I'm not sure it's any sort of waiver,

15   but I do think Mr. Tsekerides is right since this post-

16   dates claims in the lawsuit.  Since there were no claims

17   that relate specifically to this, I think it's the nose

18   under the tent problem.  And, again, without prejudice I'm

19   going to deny the application.

20           MR. NICYPER:   Your Honor, if I can address this,

21   this is a repeated thing.  There's an April 1, 2010 letter

22   that also made offers.  They continually say that if we

23   accept those offers, it resolves the claims.

24           THE COURT:   I don't think it resolves the claims

25   --

1                                                        28

2              MR. NICYPER:   Well, I don't think so either, but

3   that's their argument and that's one of the issues in the

4   case.

5              THE COURT:   I understand that's their argument.

6   I don't have to buy it to rule in their favor.  My analysis

7   is that, wholly apart from whether you accepted it or not,

8   even if you had declined the offer for whatever reason, it

9   does not relate to a claim that's presently in the lawsuit.

10  And discovery should be based on claims rather than the

11  possibility that there may be other claims lurking out

12  there.  I'm not saying that this isn't the basis of a

13  lawsuit; I'm saying it's not the basis of this lawsuit.

14             MR. NICYPER:   Well, the allegations, I mean

15  whether or not this particular agreement started later or -

16  the allegations in the complaint talk about their offers to

17  Dish and the underlying basis for those offers regarding

18  Deportes.  It's not limited to any specific point in time,

19  and, in fact, if there's continuing breach, it seems that

20  there should be - I mean certainly the complaint is worded

21  broadly enough to encompass this.

22             THE COURT:   Yeah, but you don't have a basis for

23  saying, correct me if I'm wrong, as a matter of fact now

24  that, for example, there's some breach arising out of the

25  December 6 offer.

```
 1                                                  29

 2            MR. NICYPER:   Mr. Grustis testified that Dish is

 3   offered, is owed an MFN offer.   There's an existing

 4   obligation on MFN for Deportes since December 2010.

 5            MR. TSEKERIDES:   Well, Mr. Grustis testified

 6   about --

 7            MR. NICYPER:   I'm sorry, December --

 8            THE COURT:   Let Mr. --

 9            MR. NICYPER:   December 2010.  So his testimony

10   has brought into the issue the fact that there is an

11   outstanding obligation that has not been satisfied.

12            MR. TSEKERIDES:   Your Honor, they asked a

13   question about an individual, again, in accounting who

14   tracks from a reserve perspective what is owed from

15   obligations on MFN's.

16            MR. NICYPER:   And they've reserved for this,

17   that's right.

18            MR. TSEKERIDES:   Okay, so we've reserved for it.

19   So what does that mean?  Again, we could have an offer that

20   goes out tomorrow for a deal we did for today, and they

21   have to reserve for it.  That doesn't mean there's a

22   breach, that doesn't mean anything other than the fact

23   they're reserving for it, and he said because they made an

24   offer.  Okay, they made an offer.  They made an offer to

25   Dish.  Dish doesn't take the offer, the reserve would go
```

1

2    away.  If Dish said forget about it, we don't want it, the

3    reserve goes away.

4          So, again, they're trying to mix things up by

5    saying, well, because they're reserving for it, somehow I

6    get to see the document.  No.

7          THE COURT:  The reserve I assume is not

8    contingent on it being or not being an MFN offer.

9          MR. TSEKERIDES:  No, well, it is.  I mean the

10   reserve – I make an offer to you, I have an agreement with

11   them, they have an MFN.  I make an offer to you that's

12   better than theirs for a rate.  You accept it.  So now I've

13   entered into a deal with you.  I have to make him --

14          THE COURT:  So now you have to reserve --

15          MR. TSEKERIDES:  I have to reserve because I have

16   to make, and I make the offer to him, December 6 letter

17   made the offer to him.  Okay, so now we're tracking it.  We

18   don't know when they're going to take.  Just like in 2009,

19   the offer was made and it wasn't take.

20          THE COURT:  But if there are reserves --

21          MR. TSEKERIDES:  Well, the reserve --

22          THE COURT:  Wait, hang on.

23          (Pause in proceedings)

24          MR. TSEKERIDES:  If I can continue just for a

25   second –

1

2          THE COURT:    If there are reserves out there based

3   upon the fact that I've accepted something better than that

4   which you offered to Mr. Nicyper, isn't that an implied

5   admission that the offer you made to me is an MFN offer?

6          MR. TSEKERIDES:    Two different things, Your

7   Honor.  It's not a breach of a contract for me to enter

8   into a better deal with you.

9          THE COURT:    Right.

10          MR. TSEKERIDES:    It's the breach of the contract

11   if I don't offer it to them.  Okay?  And that's what their

12   original claims are for.  We entered into these things in

13   2007 (indiscernible) on the MFN and all that kind of stuff.

14   This is not that.  The fact that I make a deal with you,

15   once I make a deal with somebody else, and I make an offer

16   to these guys, which I have to, I have to reserve for it.

17   That's not a breach.  I'm reserving for something that I

18   know I have to give somebody else, which I do December 6.

19   If they take it, then I know that I have the money aside

20   for that.  If they don't take it, I don't need the money

21   aside.

22          That's not a breach analysis.  That's an

23   accounting analysis of whether or not somebody's going to

24   take an obligation I owe them, which I made them an offer

25   on in December.  That's very different than talking about –

hold on a second – very different than talking about, well,

you made an offer to that guy and you didn't give it to me.

All right, well, that alleges a breach of contract.  That's

not this.  Made an agreement in September, made an offer to

them in December, that's the Deportes September 2 going

forward.  They didn't have that claim when they filed.  You

don't file lawsuit saying, well, I know you breached here,

and, you know, in two years from now, if you enter into

another deal, that's a breach too.  That's what we're

talking about here, and you're right in your rulings.

          MR. NICYPER:   The fact is there was an

obligation, they created a reserve for it, it's just the

exact same situation we've had with each one of these.

This is a continuing Time Warner issue with Deportes.

          THE COURT:   But where's the breach if they offer

me X, which is an improvement over what you have, they

offer it to you --

          MR. NICYPER:   There you go.  Who said they

offered that to me?  What they did is sent us a letter, and

what we know from the other offers is what they offered to

us was not the same as what they gave to other people, and

that's the issue.  They have not, we can argue, offered us

--

          THE COURT:   That's discovery, is it not, as to

2   future potential claims rather than ones you know you have?

3          MR. NICYPER:   Well, it's the same issue as

4   always, they're hiding the ball and it's information that

5   only they know, and we don't have access to.  I think quite

6   clearly the record establishes that with respect to every

7   one of these prior offers, Time Warner in each instance

8   what we got is not what Time Warner got.

9          MR. TSEKERIDES:   And that's a fabrication.  The

10  witnesses that have testified so far have made clear that

11  they were – as I said here, they were going to be made

12  whole, and he said, well, that's just Mr. Tsekerides

13  talking.

14          THE COURT:   Well, that's part of the – you know,

15  when we were talking about the potential of settling this

16  case, which is what led to some of the disclosures way back

17  when, as I understand it, ESPN takes sort of a macro

18  approach to this which is when you add up all the columns

19  and come up with the answer, even though we may have given

20  you something that's less favorable to this item in a

21  package, the package overall is more favorable to you.  So

22  you haven't lost.  I may be wording inartfully.  Whereas

23  Dish is saying, well, we don't have to look at the whole

24  package.  If you haven't given us as to ESPN Deportes, or a

25  particular roll-up or roll-down, the same deal, you lose

1

2   ESPN.

3              MR. TSEKERIDES:   It's a little different, Your

4   Honor, the SWAP, the Deportes is a little bit more specific

5   than the SWAP.  On the Deportes, we're talking specifically

6   about the other deals --

7              THE COURT:   Forget my specific examples, do you

8   agree that conceptually, part of the fight here is ESPN is

9   looking at it at a macro level in terms of deals offered to

10  other people and modifications to those deals, and you

11  contend that Dish is looking at it at a micro level?

12             MR. TSEKERIDES:   Again, very generally, and I

13  would think more with the SWAP than with Deportes because I

14  think Deportes there are specifics about that.  And I think

15  the record evidence shows that if you take the Time Warner

16  deals, the ones from before March and June of 2009 and add

17  them, and they had witnesses on this adding columns up –

18  the accounting guy took them through that – the numbers

19  match.  So they can whatever they want, and when the trial

20  happens in this case, we'll prove it, but, again, all of

21  that is a side show because when they filed their multiple

22  complaints, the September 2, 2010 is after.  That original

23  complaint that came in was dealing with specific things.

24             If they're right, then any time we do a deal and

25  they get a letter, they're going to say, well, I don't

know, this letter could be all made up.  Let me get some

discovery behind that letter.  That's not right.

        THE COURT:   I'm going to adhere to my ruling, but

I'm going to direct you, Mr. Nicyper, to send me the

relevant portion of the - is it Gretskin, the accountant --

        MR. NICYPER:   Grustis.

        THE COURT:   Grustis deposition, and I'll consider

it further.  You can send me a letter walking me through

it, and you can respond obviously.

        MR. TSEKERIDES:   Thank you.

        MR. NICYPER:   We only have the rough draft now,

which I can send to you --

        THE COURT:   You can wait, you can do it on the

rough.  I leave that to you.

        MR. TSEKERIDES:   We'll have it in a few days.  We

got it expedited.

        THE COURT:   Let me get to the MFN summaries.

        MR. TSEKERIDES:   Yep.

        MR. NICYPER:   This is an issue where plain and

simple we're talking about a relevant document.

        THE COURT:   Well, let me first ask a question

because there are contract summaries referred to and there

are MFN summaries referred to, and it wasn't clear to me

whether the MFN summaries are a way of printing out the

1

2  contract summaries or whether there's a discrete database

3  that's MFN summaries or whether this is one humongous

4  relational database.  I guess it's Share Point software.

5          MR. TSEKERIDES:   Right, I mean what it is

6  basically is you'll have the provisions of a contract.  So

7  I have the contract and take the provisions of the contract

8  and summarize them and say, okay, in this contract it has

9  these things, in this contract it has these things, in this

10 contract it has these things.  And I think, more

11 importantly, what Mr. --

12         THE COURT:   Who does this, is this somebody in

13 general counsel's --

14         MR. TSEKERIDES:   I don't know the answer to that.

15 But what Mr. Ratchman testified to was, and what I think

16 what they mischaracterize, is that that's not used to

17 determine whether we need to make an MFN offer.  That's not

18 a protocol on whether to make an MFN offer or analyze

19 MFN's.  What he said was the contract matters.  We have

20 these summaries and it's there, yeah, I can look at a

21 summary generally and say, hey, what's there.  Oh, this?

22 Let me go look at the contract.  At the end of the day,

23 it's the contract, and there's nothing --

24         THE COURT:   I don't disagree with you.  But

25 suppose that, for example, the contract is not a model of

1

2    clarity, and suppose that the MFN summary, because somebody

3    did it summary fashion and hurriedly, says something stupid

4    about what the contract provision is, that you disagree

5    with and perhaps the finder of fact would disagree with,

6    it's flat out wrong, but it's in there, why aren't they

7    entitled to it?  With respect to the relevant agreements.

8            MR. TSEKERIDES:   Yeah, I mean from what I know,

9    and I can't speak to it, from what I know it's the contract

10   term taken out of the contract and stuck on a piece of

11   paper, you know, so it's verbatim the thing, but I can't

12   make that representation.  And I don't have a really good

13   answer to that because I think that's a fair point.  If, in

14   fact, somebody said, hey, this is what it means --

15           THE COURT:   Let me stop you.  If it's literally

16   an electronic cut and paste, then the only argument you

17   have is burden, and duplicativeness I think you did say in

18   a letter, rather than that it's not relevant.

19           MR. TSEKERIDES:   Well, let me - if I could --

20           THE COURT:   So let's assume my hypothetical which

21   is ESPN hired some second year law student --

22           MR. TSEKERIDES:   Well, then it might be

23   privileged --

24           THE COURT:   -- from X law school - I'm sorry?

25           MR. TSEKERIDES:   Then it might be privileged if

38

it's a lawyer's summary.  I don't know enough about it to

tell you that it's not a lawyer who summarized it.

        MR. NICYPER:   Well, there's been no objection on

privilege.

        THE COURT:   But it's not --

        MR. TSEKERIDES:   Oh, yes, there has been.   There

has been.

        THE COURT:   It's not work product because it's

not in anticipation of litigation, and it's not an

attorney-client communication because somebody sitting in

the cell they've been assigned for the summer in my

hypothetical, and simply saying what their understanding of

the provision is --

        MR. TSEKERIDES:   If we got down that road, I'd

like to brief that issue, but I hear what you're saying.

You know, like I said, I think you're right that if the

document had somebody's interpretation, and I'm going to

reserve on the privilege fight if we ever have that, then

I'd have to just deal with it in a trier of fact situation.

I mean what I was going to suggest was to submit it again

to you for you to take a look at, but I don't know if

that's going to work here either.

        THE COURT:   Not unless I become that second year

law student and spend a summer probably looking at all this

                                                              39

1
2   stuff because --

3          MR. TSEKERIDES:   Well, Miss Lu may --

4          THE COURT:   Mmm?  I mean I think you may – yeah,

5   she does all the hard work, so it would be probably better

6   if I spent the summer.  I mean you may be able – if it's

7   literally a cut and paste, perhaps you can convince Dish

8   that it's not worth the exercise.

9          MR. TSEKERIDES:   I don't know enough about that

10  to comment.

11         THE COURT:   Failing that, I do think for the

12  relevant agreements it has to be turned over.

13         MR. TSEKERIDES:   You make a good point.

14         THE COURT:   Write that down, Meagan, a lawyer

15  said I made a good point.  That brings us to --

16         MR. NICYPER:   I'll concur on that.

17         MR. TSEKERIDES:   We fight, but we're fair.

18         THE COURT:   That brings us to the Verizon

19  internet agreement.  Let me just ask one question that

20  occurred to me as you were talking about this, is this a

21  jury trial or not, I forget?

22         MR. NICYPER:   Yes.

23         MR. TSEKERIDES:   I'm reserving.  I don't know.

24  We're having a fight in the state court about whether we're

25  having a judge or a jury trial.

```
 1                                                    40
 2              THE COURT:   Let me just see what the docket is.
 3              (interposing)
 4              MR. TSEKERIDES:   -- I'm just not conceding it.
 5              MR. NICYPER:   This is federal court not state
 6     court.
 7              MR. TSEKERIDES:   I know, I'm not conceding
 8     anything.
 9              THE COURT:   Jury demand plaintiff is what it
10     says.
11              MR. TSEKERIDES:   Okay.
12              THE COURT:   Verizon.
13              MR. TSEKERIDES:   Verizon, should I talk about
14     Verizon?
15              THE COURT:   Somebody should.
16              MR. NICYPER:   Verizon's simple, Your Honor.
17     There is a Section 3F claim, this is one we talked about
18     before with the internet.  We have witnesses who say that
19     Verizon has this deal as well.
20              THE COURT:   Okay, but suppose Verizon rather than
21     the end-run I talked about last time, suppose Verizon is
22     paying some form of additional remuneration in order to
23     have the right to distribute over the internet, then
24     there's no MFN violation.
25              MR. NICYPER:   But there's no evidence of that,
```

1  Your Honor.  This --

2          THE COURT:  But conversely there's no evidence

3  that there is no remuneration - I have trouble with that

4  word, forgive me - so why is it at this juncture relevant?

5          MR. NICYPER:  A witness will be asked the

6  question, and I'm quite certain, because now my familiarity

7  with the way these companies work, that the answer will be

8  the same.  But --

9          THE COURT:  Well --

10          MR. NICYPER:  -- it requires asking another

11  witness the same question --

12          THE COURT:  And let me then turn it around and

13  ask you, Mr. Tsekerides, if - I'm not sure, what's the time

14  period of the Verizon agreement?

15          MR. TSEKERIDES:  You know, I don't know.  I think

16  it might have been December.  I don't know.

17          THE COURT:  But if somebody says, yeah, we

18  actually used the same --

19          MR. TSEKERIDES:  Cut and paste.

20          THE COURT:  -- cut and paste, so, therefore,

21  there was no additional money, we just deemed it, why

22  aren't they entitled to that?

23          MR. TSEKERIDES:  I think the simple answer is

24  they don't have a claim for that.  Again, they have a claim

1

2   for we breached 3F when we entered – allegedly breached 3F

3   – when we entered into a deal with Time Warner Cable.

4   Okay.  We'll litigate that issue, and maybe it'll be a

5   bellwether issue.  Maybe all the agreements are the same,

6   and once we decide on one, we'll know forever.  So I would

7   say at this juncture there's no claim for that.

8           MR. NICYPER:   Your Honor, it just seems

9   ridiculous to require us in each one of these instances –

10  my sense is there may be other agreements here as well – to

11  have to amend the complaint time and time and time again

12  when we have the exact same issue, the exact same

13  provisions --

14          THE COURT:   Well, it may be that it's covered in

15  some of the language of your complaint, but if it is and it

16  make sense that you be right, if it is essentially the same

17  end-run for whatever number of agreements, you can explore

18  that with Connolly or others, and I'll reserve decision

19  about whether or not you get the agreements.  If I direct

20  at some point you get the agreements or the relevant

21  portions thereof, there's not going to be any big surprises

22  there, so you're not really prejudiced.

23          MR. NICYPER:   It's impossible to know without

24  seeing the agreement, so that may be true.  But certainly,

25  you know, this is an issue and obviously --

```
1                                                        43
2              THE COURT:   But let's --
3              MR. NICYPER:   I can see it will go to damages as
4   well if there's one distributor who's distributing the
5   stuff on the internet for free.  It's going to be
6   compounded if there are two and if there are three, and so
7   --
8              THE COURT:   And that may be a viable argument.
9   But conversely, if you're wrong – and I suspect you're
10  probably right – but if you're wrong and there is some
11  additional consideration, then there's no breach.
12             MR. NICYPER:   But only the agreements will know,
13  and, unfortunately, again, this is more stuff being
14  withheld from us --
15             THE COURT:   But it's not --
16             MR. NICYPER:   -- we're running blind here, and
17  I'll acknowledge that.
18             THE COURT:   Well, yeah, but I think that's the
19  position you have to be in until you find something, it may
20  not be fair --
21             MR. NICYPER:   But, Your Honor, yes, that's true,
22  but we're running blind with experience.  In other words,
23  this is an educated request --
24             THE COURT:   Okay, but--
25             MR. NICYPER:   -- we've made this based on
```

1

2  experience --

3          THE COURT:   But then in every case where

4  somebody's position is in a commercial circumstance, they

5  did me dirty in the past, it would be so I want a roving

6  commission to police what they're doing now so that I can

7  ensure I'm not getting hosed in the future.

8          MR. NICYPER:   We can address this with Mr.

9  Connolly provided he is not going to claim lack of

10 recollection, I don't know.   I don't have the agreement in

11 front of me.   We'll address it with him.   And if he has the

12 agreement in front of him, obviously --

13         THE COURT:   He now has constructive notice

14 through his counsel that this will come up, and you have an

15 additional six hours to explore this with him.   So between

16 those two things, I don't imagine that he'll dodge the

17 bullet.

18         MR. TSEKERIDES:   Well, on Connolly, just sort of

19 going back, the 15th was a booked up date, but we're going

20 to endeavor - because we really would prefer if it's going

21 to be, as you said, the six hours, that it happen the next

22 day.   So before we leave here today, I would like a

23 commitment from Dish that if it works for Mr. Connolly that

24 the next day would be the continuation.   As they said, they

25 were prepared to do that in their letter, so hopefully

```
 1                                                        45
 2   they're not going to backtrack.
 3          MR. NICYPER:   We'll make it work.
 4          THE COURT:   Okay, good.  I had a hunch that you
 5   might, despite his busy schedule, find that --
 6          MR. TSEKERIDES:   Well, he will have to move a lot
 7   around, but, you know --
 8          THE COURT:   Okay, and --
 9          MR. NICYPER:   If there are other consecutive
10   days, we'll make, you know --
11          THE COURT:   Okay, I'll direct that he be deposed
12   the 15th and the 16th unless you folks otherwise --
13          MR. TSEKERIDES:   14th, 15th --
14          MR. NICYPER:   14th, 15th.
15          THE COURT:   14th, 15th, like I said, unless you
16   folks otherwise agree.
17          MR. TSEKERIDES:   I have a couple of issues that
18   I'd like to raise.
19          THE COURT:   Okay.
20          MR. TSEKERIDES:   We put in our letter about two
21   depositions we've been trying to get, and we're still
22   waiting for a date from Mr. Cohen, and I would like the
23   Court's intervention to try get those dates.  But before I
24   move to that one, with respect to Mr. Vogel, I think it was
25   yesterday for the first time, we've been asking since at
```

```
 1
 2   least February for a date from him, and yesterday we heard
 3   from Dish a couple of things.  One that they would only –
 4   he doesn't work for the company anymore, though he's been
 5   in and out of that company, a very senior executive there
 6   for quite some time.
 7              THE COURT:   This is who?
 8              MR. TSEKERIDES:   Mr. Vogel, Carl Vogel.  And that
 9   his deposition could only be the 19$^{th}$, 20$^{th}$, or 21$^{st}$.  None
10   of the attorneys working on this matter are available then,
11   which is Passover and Easter.  But, more importantly --
12              THE COURT:   Where is he located?
13              MR. TSEKERIDES:   Well, this is what I'm getting
14   to.  More importantly, they're saying he can only be
15   deposed in Denver.  And so we have a couple of issues with
16   that.  First is, all right, if we have to go to Denver,
17   we'll have to go to Denver, but we then want some kind of
18   direction that this witness does not come into the trial.
19   Because if they can control him to come to New York for
20   trial, they can make him come to New York for a deposition
21   too.
22              So we'll go to Denver and we can figure out a date
23   that works for everybody if that's what works for the
24   witness, but then he should be precluded from testifying.
25   If they're going to have him come to the trial, they should
```

1

2 have to bring him to the deposition.

3          MR. NICYPER:   I don't see the quid pro quo.   I

4 have no idea whether we'd call him to trial, depending

5 probably on what he says at his deposition.

6          THE COURT:   Well, if you have discussions with

7 him about whether he's willing to come to New York either

8 for his deposition or for a trial --

9          MR. NICYPER:   The discussions are indirect, Your

10 Honor, so I --

11          THE COURT:   Through his counsel?

12          MR. NICYPER:   Yeah.

13          THE COURT:   Okay, and what's --

14          MR. NICYPER:   I'm sorry, through in-house

15 counsel.  So I haven't had direct discussions, and I don't

16 know whether in-house counsel has had discussions through

17 somebody else.  Unfortunately, he hasn't been as an

18 employee of the company I think since 2009 or something

19 like that.

20          MR. TSEKERIDES:   Your Honor, the point would be -

21 I'm sorry, go ahead.  If he's out of their control, which

22 is what they're saying, fine, they would not be able to

23 compel him to come to a trial.  He's outside the

24 jurisdiction.  Oh, my God, all of a sudden, he can come to

25 the trial because he's a good friend of ours, but he

```
 1                                                         48
 2   couldn't come to the deposition.  That's what will happen,
 3   and that's not fair.
 4           MR. NICYPER:  We're producing him.  We're
 5   producing him for a deposition --
 6           MR. TSEKERIDES:  In New York?
 7           MR. NICYPER:  He's having a deposition in Denver.
 8           MR. TSEKERIDES:  Well, we don't want to have to
 9   travel --
10           MR. NICYPER:  We haven't required them to issue
11   subpoena.  Whether he's within our control, what we're
12   saying is he's got a very busy schedule, he does a lot,
13   he's available in Denver.  He also happens to have a child
14   who has a serious disability, and he's reluctant to leave
15   home.
16           THE COURT:  Well, I'm not going to require that -
17   I'm not sure I could require that Dish produce him in New
18   York.  What I will say is if he's deposed in Denver and
19   appears for trial in New York, and I suppose while you're
20   out there in Denver, you'll be able to explore what his
21   understandings are with Dish.  If it's an arrangement
22   where, in effect, he's not cooperating by coming for the
23   deposition but is more than willing to come for purposes of
24   a trial, I may shift the additional costs associated with
25   the trip to Denver at an appropriate point.  That's
```

1

2   probably after the trial, but at an appropriate point.

3          MR. NICYPER:   I think, Your Honor, the main issue

4   here is it's not that Mr. Vogel is never available in New

5   York, but within the timeframe we're talking about, he is

6   not able to come to New York.  It's three days.  Now, he

7   said it was over Easter or something.  This is a Tuesday,

8   Wednesday, and Thursday I think he offered to make himself

9   available.

10          MR. TSEKERIDES:   We are not available.  The

11  lawyers working on this case are not available on these

12  three dates that they gave us, which is I'm away for

13  Eastern, and the other two attorneys, one of which is

14  observant, is going to be out, and the other one is also --

15          THE COURT:   That's the only three-day time slot?

16          MR. TSEKERIDES:   That's all they gave us.

17          MR. NICYPER:   This is what, I mean we offered

18  three days.  Most of the offers we get from them is one

19  day.

20          THE COURT:   Why don't --

21          MR. NICYPER:   We get to chose it or not chose it.

22  We've offered three --

23          THE COURT:   Why don't you see whether there are

24  other days --

25          MR. NICYPER:   We'll try to see if there are other

1                                                           50

2  alternatives.  We haven't heard back from him on this, Your

3  Honor, they haven't told us --

4          MR. TSEKERIDES:   The answer is we're not

5  available.  We just got it yesterday.

6          THE COURT:  So look for other days.

7          MR. TSEKERIDES:  So --

8          MR. NICYPER:  We'll look for other days.

9          MR. TSEKERIDES:   -- connected to that with the

10  other days and what you started the conference with, if the

11  other day is after May 10, we're going to need some

12  flexibility.

13          THE COURT:  I don't have a problem with that.

14          MR. TSEKERIDES:  And then if you could direct

15  them to get us a date on Mr. Cullen by some date certain,

16  that would be helpful.

17          MR. NICYPER:  We are working on that.  Mr. Cullen

18  has a very senior position.  He is working on trying to get

19  a date very hard.  They've just done several acquisitions.

20          THE COURT:  But he's on the ranch.

21          MR. NICYPER:  On the ranch?

22          MR. TSEKERIDES:  He works for Dish.

23          THE COURT:  He works for you folks.

24          MR. NICYPER:  He does, and he works hard, and

25  he's --

```
 1                                                    51
 2            MR. TSEKERIDES:   So do our witnesses.
 3            MR. NICYPER:   He's working on getting a date, and
 4   we plan to offer a date as quickly as we can.
 5            THE COURT:   Well, get them --
 6            MR. TSEKERIDES:   And not the week of the 18th,
 7   19th, 20th, and 21st.
 8            THE COURT:   A date that's not a religious holiday
 9   for some religion.
10            MR. NICYPER:   Unfortunately, they've blocked out
11   I guess that entire week --
12            THE COURT:   Okay.
13            MR. NICYPER:   -- which is unfortunate because
14   there's not a lot of time between now and the end of the
15   discovery cutoff.
16            THE COURT:   But if --
17            MR. TSEKERIDES:   They've had the request for
18   quite some time.
19            THE COURT:   If one of the attorneys is observant,
20   there's basically eight days that have gone out the window.
21            MR. NICYPER:   That's right, but this is Weil
22   Gotshal, and I think they have more than one attorney.
23            MR. TSEKERIDES:   Yeah, but not every attorney on
24   Weil Gotshal works on the case.
25            THE COURT:   You're lucky Weil Gotshal doesn't
```

```
                                                           52
 1
 2   shut down for the eight-day period.

 3              MR. TSEKERIDES:   But not every lawyer at Weil

 4   Gotshal works on this case.

 5              MR. NICYPER:   It seems to be most of them.

 6              MR. TSEKERIDES:   It's just me here today.

 7              THE COURT:   I'm going to direct that you provide

 8   a date other than the week of the 18th to Mr. Tsekerides

 9   within one week from today, and you should inform the

10   witness that if I have to deal with these disputes, I

11   resolve them very quickly and efficiently, and it involves

12   a calendar and a dart.  And I will simply direct that he

13   appear on whatever date the dart lands on, even if it's a

14   Saturday or a Sunday.  So it's in everybody's interest for

15   him to focus on the issue.

16              MR. NICYPER:   Your Honor, that's fine.  It

17   troubles me that they've raised this.  Obviously, they want

18   some counterargument here.  But we both sides have been

19   working very hard to schedule all these witnesses, and I

20   think all the witnesses are working in good faith.

21              THE COURT:   I don't --

22              MR. NICYPER:   By the same token, there's one

23   witness on their side, Mr. Raymond, who's cancelled twice.

24   We've had preparations, people have made plans, and they

25   cancelled the deposition.  So this is not a one-way street
```

```
 1                                                    53

 2  --

 3              THE COURT:   Is there a date currently for him?

 4              MR. TSEKERIDES:   I have no idea, Your Honor.

 5              MR. NICYPER:   I believe there currently is, and

 6  hopefully this one will stick.

 7              THE COURT:   If you want me to so order it, I

 8  will.

 9              MR. NICYPER:   Sure, that will be helpful.

10              MR. TSEKERIDES:   Do we have a date --

11              MR. NICYPER:   April 22.

12              MR. TSEKERIDES:   Did we offer that date to you?

13  Well, hold on a second, this is not -

14              FEMALE:   I'm not making this up.

15              MR. TSEKERIDES:   Well, you know, you had notice

16  of, and you've had notice about Vogel and Cullen for quite

17  a while.

18              THE COURT:   Well, let me --

19              MR. TSEKERIDES:   Before we --

20              THE COURT:   Wait, time out.

21              MR. TSEKERIDES:   -- start ordering dates --

22              THE COURT:   Time out.

23              MR. TSEKERIDES:   -- I'd like some facts.  Not

24  from them.

25              THE COURT:   Send me a letter so that Mr.
```

1                                                                54

2  Tsekerides has an opportunity to respond representing what

3  the agreed date for his deposition is, and I'll so order

4  it.   If there's a reason he cancelled twice, which seems to

5  be poor form, but if there's some relative who's on their

6  deathbed or something, then I probably won't so order it.

7  But it seems to me if (indiscernible) it ought to occur

8  unless there's some particular reason that that's

9  unreasonable.

10          MR. TSEKERIDES:   Okay.

11          THE COURT:   Anything else from anyone?

12          MR. NICYPER:   I don't think right now, Your

13  Honor, thank you very much.   I appreciate your time.

14          MR. TSEKERIDES:   Thank you.

15              (Whereupon the matter is adjourned.)

16

17

18

19

20

21

22

23

24

25

1                                                          55

2                        C E R T I F I C A T E

3

4          I, Carole Ludwig, certify that the foregoing

5   transcript of proceedings in the United States District

6   Court, Southern District of New York, DISH NETWORK v. ESPN,

7   et al., Docket #09cv6875, was prepared using manual

8   transcription equipment and is a true and accurate record

9   of the proceedings.

10

11

12

13

14   Signature_____

15                       CAROLE LUDWIG

16   Date:  April 13, 2011

17

18

19

20

21

22

23

24

25